IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| COLETTE AOKI, Individually and as | ) | CIVIL NO. 20-00464 HG-RT |
| Personal Representative of the | ) | |
| ESTATE OF GRACE S. AOKI; et al., | ) | MEMORANDUM IN SUPPORT OF |
| Plaintiffs, | ) | MOTION |
| | ) | |
| vs. | ) | |
| | ) | |
| MOBILEHELP LLC; et al., | ) | Judge:  The Honorable Helen Gillmor |
| Defendants. | ) | Trial Date:  March 15, 2022 |
| _____ | ) | |

843-3/MPSJ

## MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

This is a product liability case.  Plaintiffs seek to blame the November 25, 2019 death of Grace S. Aoki, on the alleged failure of a MobileHelp medical alert system in her apparent possession on that day.  *See* ECF 1-1, ¶¶ 36, 37.

However, Plaintiffs have no credible evidence whether, when, and if so, how, in fact, Grace S. Aoki attempted to press <u>any</u> of her medical alert buttons on November 25, 2019; no credible evidence whether, when, and if so, how, in fact, the pendant failed on November 25, 2019; and no credible evidence establishing the time and cause(s) of Grace S. Aoki's death on November 25, 2019, to a reasonable degree of medical probability.  Without such evidence, Plaintiffs' case is one of conjecture and speculation.  Without such evidence, Plaintiffs cannot

meet their burden of proving that Defendants were a ***legal cause*** of Grace S.

Aoki's death, and Plaintiffs' claims must fail for lack of causation.

## II.  BRIEF PROCEDURAL HISTORY

On September 24, 2020, Plaintiffs filed an action, *Colette Aoki, Individually,*

*et al. vs. MOBILEHELP, LLC; et al.,* in Hawai'i state court.  *See* ECF 1-1.  On

October 29, 2020, the action was timely removed to this court.  ECF 1.  On

November 11, 2020, an Answer was filed on behalf of all 4 named-defendants.

ECF 8.  On December 22, 2020, a STIPULATION FOR PARTIAL DISMISSAL

WITHOUT PREJUDICE OF DEFENDANTS MOBILEHELP HOLDINGS, LLC

and MOBILEHELP EMPLOYEE HOLDINGS, LLC; & ORDER, was filed.  ECF

26.  The two movants, MOBILEHELP, LLC ("MH") and MOBILEHELP

GROUP HOLDINGS, LLC ("MGH") remain in the case.

## III.  STATEMENT OF THE CASE

Defendant MH, formed as Integrity Tracking, LLC, was a Pennsylvania

LLC until March 29, 2017, when it was re-domiciled as a Delaware LLC.  MH is

qualified in Florida, and headquartered at 5050 Conference Way N., Suite 125,

Boca Raton, Florida 33431.  MH transacts business throughout the United States

and is a provider of mobile Personal Emergency Response Systems and health

management solutions.  CSF at no. 1.

Defendant MGH, was formed and is registered as a Delaware LLC.  MGH is an equity holding company whose only purpose is to own equity in MOBILE-HELP HOLDINGS, LLC (one of the entities dismissed via ECF 26).  MGH has no employees, does not transact or engage in business, does not provide goods or services to consumers, does not advertise, and does not have any interaction with MH or MH's business operations.  CSF at no. 1.

On or about October 12, 2011, Ms. Linda L. Sakuma ("Ms. Sakuma") purchased an MH medical alert system for her friend, Grace S. Aoki ("Ms. Aoki").[1]  Ms. Sakuma purchased the MH Classic System, which included a wired base station, a neck pendant, and a wrist button.  CSF at no. 3.

On or about October 14, 2011, MH shipped the enumerated items on MHL 0043, to Ms. Aoki at 869 Ahukini Street, Honolulu, HI 96825-2515.  This shipment included, *inter alia*, the system and the MH Personal Emergency System Monitoring Agreement (MHL 0213-216) (hereinafter, "the Agreement").  CSF at no. 3.  The Agreement, between MH ("the Company") and Ms. Aoki ("the Subscriber"), stated that:

> By activating the System (as defined below) and sending a test signal to the Center (as defined below), the Subscriber confirms that he/she has read this Agreement and accepts all of the terms and conditions contained herein.

CSF at no. 3 (MHL 0213; hi-lites added).

---

[1] On the same day, Ms. Sakuma also purchased an identical MH system for herself.

Paragraph 3 of the Agreement stated that:

3.     THE SYSTEM AND MONITORING SERVICE HAS CERTAIN LIMITATIONS. IN CONSIDERATION FOR THE PROVISION OF THE SYSTEM AND MONITORING SERVICE, YOU ACKNOWLEDGE THAT WE DO NOT REPRESENT OR WARRANT THAT THE SYSTEM OR MONITORING SERVICE WILL PREVENT DEATH, BODILY OR PERSONAL INJURY, OR ANY OTHER INJURY OR DAMAGE TO YOU OR OTHERS WHO USE THE SYSTEM AND YOU OR OTHERS WHO USE THE SYSTEM DO NOT AND HAVE NOT RELIED UPON ANY EXPRESS OR IMPLIED REPRESENTATION BY COMPANY TO THAT EFFECT. WE MAKE NO REPRESENTATION OR WARRANTY AS TO THE PROMPTNESS OF OUR OR THE CENTER'S RESPONSE, AND WE HAVE NO CONTROL OVER THE RESPONSE TIME OR CAPABILITY OF ANY AGENCY OR PERSON WHO MAY BE NOTIFIED AS A RESULT OF THE SYSTEM BEING USED. YOU FURTHER UNDERSTAND THAT WE OR THE CENTER MAY BE NEGLIGENT IN PROVIDING THE SERVICE, AND MAY FAIL TO PROPERLY RESPOND TO THE RECEIPT OF AN EMERGENCY SIGNAL FROM THE SYSTEM, OR THAT THE SYSTEM MAY FAIL TO FUNCTION PROPERLY. IT IS UNDERSTOOD THAT A PORTION OF THE SYSTEM RELIES UPON THE AVAILABILITY OF CELLULAR NETWORK COVERAGE TO OPERATE PROPERLY AS WELL AS THE AVAILABILITY OF SATELLITE GPS DATA, BOTH OF WHICH ARE PROVIDED BY A THIRD PARTY THAT IS NOT CONTROLLED BY THE COMPANY. YOU AGREE THAT IF WE OR THE CENTER WERE TO HAVE ANY LIABILITY GREATER THAN THAT AGREED TO BY YOU PURSUANT TO SECTION 17 OF THIS AGREEMENT, WE COULD NOT AND WOULD NOT PROVIDE THE SYSTEM OR SERVICE. YOU ACKNOWLEDGE THAT YOU SHOULD OBTAIN ANY LIFE, MEDICAL, LONGTERM CARE OR DISABILITY INSURANCE FOR THE PROTECTION OF YOURSELF AND OTHERS WHO MAY USE THE SYSTEM. YOU UNDERSTAND THAT THERE ARE ALTERNATIVES AVAILABLE TO YOU SUCH AS 911 EMERGENCY TELEPHONE SERVICE AND YOU HAVE SELECTED THIS SERVICE WITH A FULL UNDERSTANDING OF ITS LIMITATIONS, AND THE LIMITATION OF OUR LIABILITY SET FORTH IN SECTION 16.

CSF at no. 3 (MHL 0213; hi-lites added).

Paragraph 7 of the Agreement set out the SUBSCRIBER'S DUTIES:

"You shall:
(a) install and test the System in accordance with the instructions provided including performing a range test, GPS lock test, and a signal test to the Center;

(b)  use the System and Monitoring Service in accordance with the terms and conditions of this Agreement and the procedures and specifications provided by Company and shall not use the System and Monitoring Service for any other purposes;

(c)  instruct all other persons who may use the System ("Users") on its proper use;

(d)  test the System and send test signals to the Center on a monthly basis to ensure the proper operation of the System.  If the Center does not respond to the test signal, you should call the customer support number indicated in the User Guide and confirm the status of the test; * * *

(g)  provide and be responsible for suitable electrical service for installation and operation of the System; * * *"

CSF at no. 3 (MHL 0214; hi-lites added).

Ms. Aoki received her MH shipment on October 24, 2011.  Under Summary, the **6**[th] entry to MHL 0107 (an *all account tickets* spreadsheet maintained by MH for Ms. Aoki) denotes "Delivery 10/24".  On October 26, 2011, Ms. Aoki's MH system was successfully activated, set up and tested with the help of an MH technician.  Under Description, the **6**[th] entry to MHL 0107 reads:

**10.26.2011 @ 2:31 PM: George Beers - SP-2 testing successfully completed. Successful signal from BS (01) and Pendant/WB tested successfully.  Operator Response from Central Station was successful.**

CSF at no. 4.

On or about December 28, 2013, MH placed an order to upgrade Ms. Aoki's system from a wired, to a cellular base station.  On or about December 30, 2013, MH shipped the enumerated items on MHL 0074 to Ms. Aoki's home.  This shipment included, *inter alia*, a new cellular base station, a new neck pendant, a

new (black) wrist button, a return label for her to send her original equipment back to MH, and a wireless base station User Guide.  CSF at no. 5.  Ms. Aoki received this MH shipment on or before January 14, 2014, and on or about January 14, 2014, Ms. Aoki's new system was successfully set up and tested with the help of an MH technician, with her daughter Charlene Aoki also on the call.  CSF at no. 5. Under Description, the **10**[th] entry to MHL 0107 reads:

> **1.14.2014 @ 5:19 PM: Janet Manzolillo - Spoke with daughter Charlene and Grace Aoki to test Cell Classic but it was GMS CS and no migration incident was created. I completed migration and testing. <br/>Successful signals from CBS (EBW EPW EPW). Operator Response from Central Station was successful. Triangulate successful. SP-2 testing successfully completed. <br/>1.9.2014 @ 2:37 PM: Jean Andre - Grace advised that her daughter will set it up and test it on the weekends <br/>12.31.2013 @ 12:38 PM: Jean Andre - ETA 1/07/14.**

CSF at no. 5.

Between 2015 and the latter part of 2019, Ms. Aoki would have received seasonal newsletters from MH.  The purpose of these newsletters was to make MH customers feel engaged with other MH customers, to provide useful (and perhaps entertaining) information to MH users, and to remind customers to **test** their equipment on a monthly-basis.  CSF at no. 6.

On November 25, 2019, Ms. Aoki was 84 years old (1½ months shy of her 85th birthday).  She lived alone in her Hawaii Kai home.  Ms. Aoki had a number of serious co-morbidities, including legal blindness, heart attack/triple bypass surgery (2012), type II diabetes with renal complication, stage IV chronic renal

disease (severe) -- but she made very clear that she did not want dialysis treatment. CSF at no. 8.

On November 25, 2019, Ms. Aoki was supposed to meet her daughters at Kahala Mall.  The Handi-Van was to pick her up at about 10:00 a.m. and drive her to the mall.  Apparently, when the Handi-Van driver showed up at Ms. Aoki's home at about 9:59 a.m., no one answered the door, so the driver left at about 10:05 a.m.  CSF at no. 9 (at p. 0078; PU Arr 9:59a; PU Dep 1005a).

After her daughters were unable to reach her on the telephone, they went to Ms. Aoki's home and found her face-down and non-responsive on her bedroom floor.  911 was called.  The Honolulu Fire Dept. arrived first, followed by EMS at about 11:32 a.m.  After 20-minutes of unsuccessful attempts to resuscitate her, Ms. Aoki remained asystolic and EMS stopped CPR and pronounced her dead at the scene.  A hematoma was noted to the right orbital area of her face.  The presence of dried blood was noted.  There was no EMS transport.  CSF at no. 10.  Later the same day (11/25/19), Ms. Aoki's body was transported directly from her home to Nuuanu Memorial Park & Mortuary.  CSF at no. 11.  No autopsy was conducted of Ms. Aoki.  CSF at no. 12.  On November 27, 2019, Joey Y. Kohatsu, M.D., Ms. Aoki's last primary care physician (PCP), certified her Certificate of Death.  CSF at no. 17.  Ms. Aoki's body was cremated on December 2, 2019.  CSF at no. 13.

Prior to November 25, 2019, Ms. Aoki did, in fact, periodically test her MH system. Historical MH records showed that between August 9, 2015 and June 18, 2019, Ms. Aoki tested her system eight (8) times. CSF at no. 7 (Exhibit G); *compare* ECF 1-1, ¶ 31 (claiming the system was "tested regularly"); CSF no. 7 (Exhibit H) ("*She has tested the unit on many occasions . . .* "). However, Plaintiffs admitted in their discovery responses that: "*We do not believe mom tested her system monthly*" and "*We do not believe anyone tested the system monthly.*" CSF at no. 19.

## IV.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FRCP 56(a). FRCP 56(a) <u>mandates</u> summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *See* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The movant may prove there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, by demonstrating an absence of evidence to support the non-moving party's case. **Celotex**, 477 U.S. at 325. The movant bears the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." **T.W.**

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex*, 477 U.S. at 323).  However, the movant has no burden to either negate or disprove matters upon which the non-moving party bears the burden of proof at trial.  Nor is the movant required to produce any evidence on matters for which it does not bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 325.

To defeat summary judgment, Plaintiffs must show there is sufficient evidence for a reasonable jury to return a favorable verdict for them on that particular claim.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir.1997); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (opposing party must do *more* than merely raise some metaphysical doubt as to the material facts, and must come forward with specific facts demonstrating a *genuine issue for trial*).  Plaintiffs cannot defeat summary judgment in the absence of probative evidence in support of their legal theory. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec.*, 475 U.S. at 587.  However, "[i]f the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."

*Nidds*, 113 F.3d at 916 (quoting *Anderson,* 477 U.S. at 249-50) (brackets added).

## V.    DISCUSSION

### A.    Counts V, VI, and VII of Plaintiffs' Complaint are Time-Barred by the UCC Statute of Limitations.

#### 1.    Plaintiffs' Complaint Was Filed More than Four Years after Tender of Delivery of the Products.

Plaintiffs' claims for breach of implied or express warranty are governed by

the four-year statute of limitations ("SOL") in HRS § 490:2-725, providing that:

> (1)    An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. * * *
>
> (2)    A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

(emphasis added); *see Teel v. American Steel Foundries*, 529 F.Supp. 337, 343

(E.D.Mo. 1981) (plain meaning of UCC §2-725(2) is that the SOL begins to run

when delivery of the product is tendered to the purchaser; to read it any other way

would be to disregard its plain and unambiguous meaning).  Accordingly, a breach

of warranty claim must be brought within 4-years from the manufacturer's tender

of delivery of the product.  *See, e.g., Larsen v. Pacesetter Systems, Inc.*, 74 Haw.

1, 11-12, 837 P.2d 1273, 1280 (S.Ct. 1992) (4-year UCC SOL applied to plaintiff's

breach of implied warranty claim for personal injury); ***Torres v. Northwest Engineering Co.,*** 86 Hawai'i 383, 398, 949 P.2d 1004, 1019 (App. 1997) ("We similarly conclude that the UCC statute of limitations applies to a breach of express warranty claim for personal injury") (*citing **Larsen**, supra*).

Here, it is undisputed that Ms. Aoki's MH medical alert system alleged to be in her possession on November 25, 2019, had been shipped by MH on December 30, 2013, received by her on or before January 14, 2014, and successfully set up on January 14, 2014.  *See* CSF at no. 4.  Pursuant to HRS § 490:2-725(2), the SOL on any breach of warranty claims arising from those MH products received by Ms. Aoki on or before January 14, 2014, ran 4-years thereafter – on or around **January 14, 2018**.  Plaintiffs filed their warranty claims on September 24, 2020 – about 2 years & 8 months *after* the 4-year SOL had already run, thus HRS § 490:2-725 bars these untimely claims.  In addition, Plaintiffs have failed to identify any written warranties upon which their breach of express warranty claims are purportedly based.  CSF at no. 16.

    2.    <u>But Even Assuming, *Arguendo*, an Alleged Express Warranty That the Subject Medical Alert System was "Fit, Appropriate and Safe for Use" Exists, It is Not Exempt from the 4-Year SOL Because it Does Not Explicitly Extend to Future Performance.</u>

At ¶ 79 of their Complaint, under Count VI (Breach of Express Warranty), Plaintiffs allege that "Defendants warranted to Plaintiffs by affirmation of fact,

promise, description, sample, and/or model that the subject medical alert system was fit, appropriate and safe for use."  ECF 1-1 at ¶ 79; *but see*, CSF at no. 16. Even assuming, *arguendo*, that this even remotely qualifies as a UCC express warranty (which Defendants dispute), the 4-year SOL would <u>still</u> render Plaintiffs' breach of express warranty claims untimely as a matter of law.  That is, the HRS § 490:2-725(2) *exception* for an explicit warranty extending to future performance, does not apply (nor could it apply) to this *unidentified* warranty.

In addition, even assuming, *arguendo,* that what is described at ¶ 79 of the Complaint even remotely qualifies as a UCC express warranty (which Defendants dispute), it does not by its own terms "explicitly extend to future performance of the goods".  HRS § 490:2-725(2).  Nor would discovery of the breach, need to await the time of future performance, because there was no future time for performance provided in Plaintiffs' *purported* "express warranty".  *See Id.*  In short, the HRS § 490:2-725(2) extension simply does not apply in this case.

3.   <u>Implied Warranties by Their Very Nature Cannot Explicitly Extend to Future Performance.</u>

It is a foregone conclusion that ***implied*** warranties are not explicit, thus do not, and indeed cannot, involve the UCC exception for express warranties of future performance.  Most courts, including this one, have held that the exception for warranties extending to future performance cannot apply to implied warranties because by their inherent nature, implied warranties "never explicitly extend to

future performance." ***Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.***, 23 F.3d 1546, 1550 (9th Cir. 1994) (citation omitted); *see **Holliday v. Bell Helicopters Textron, Inc.***, 747 F.Supp. 1396, 1397 (D.Haw. 1990) (by its terms, the future performance exception does not apply to implied warranty claims).

### B.  Defendants Are Entitled to Partial Summary Judgment as to Count VIII - Breach of Duty of Good Faith and Fair Dealing.

In every contract, there is an implied covenant of good faith and fair dealing that neither party shall do anything to deprive the other of the benefits of the agreement.  *See **Simmons v. Puu***, 105 Hawai'i 112, 118, 94 P.3d 667, 673 (Sp.Ct. 2004), quoting ***Best Place, Inc. v. Penn America Ins. Co.***, 82 Hawai'i 120, 123, 920 P.2d 334, 337 (1996).  "The obligation to deal in good faith is now a well-established principle of contract law."  ***Simmons***, 105 Hawai'i at 119, 94 P.3d at 674, *citing to*, Restatement (Second) of Contracts § 205 (1979); ***Hawai'i Leasing v. Klein***, 5 Haw.App. 450, 456, 698 P.2d 309, 313 (1985); HRS § 490:1-203 (every contract imposes an obligation of good faith in performance or enforcement).  However, "Hawai'i generally does not recognize tort claims for breach of good faith or fair dealing outside the insurance context."  ***Alii Sec. Sys. v. Prof'l Sec. Consultants***, 139 Hawai'i 1, 9, 383 P.3d 104, 112 (App. 2016) (citing with approval, ***Gold Refinery, LLC v. Aloha Island Gold, LLC***, 2012 U.S. Dist. LEXIS 18898, at *7 (D.Haw., Feb. 15, 2012)); ***Laeroc Waikiki Parkside, LLC v. KSK (Oahu) Ltd. P'ship***, 115 Hawai'i 201, 229, 166 P.3d 961, 990 (Sp.Ct. 2007)

(expressly holding that "there is no tort of bad faith outside the context of insurance claims").  Indeed, this court in ***Stoebner Motors***, dismissed claims for breach of the implied covenant of good faith and fair dealing (together with the plaintiff's breach of warranty claims), reasoning as follows:

> Based on the new language in Official Comment 1 to § 490:1-304, other courts' interpretations of the section, and the Hawaii Supreme Court's statements limiting the tort of bad faith, the court predicts that the Hawaii Supreme Court would interpret HRS § 490:1-203 (and its successor § 490:1-304) to preclude an independent cause of action for failure to perform or enforce a warranty in good faith.  Because the court concludes that there is no independent cause of action, Stoebner's claim for breach of the implied covenant of good faith and fair dealing in Count II is dismissed.

***Stoebner Motors, Inc. v. Automobili Lamborghini S.P.A***., 459 F.Supp.2d 1028, 1037-38 (D.Haw.2006); *see also*, ***Marisco, Ltd. v. GL Eng'g & Constr. Pre., Ltd***., 2020 U.S. Dist. LEXIS 112819, at *6 (D.Haw., June 26, 2020) (reiterating that Hawai'i law generally does not recognize a tort claim for breach of good faith and fair dealing in other than the insurance context).  As in ***Stoebner***, Plaintiffs' claim for breach of the implied duty of good faith and fair dealing should be dismissed as a matter of Hawai'i law.

### C.    There is No Cognizable Claim in Hawaii for Loss of Chance.

At Count IX of their Complaint (¶¶ 94-97), Plaintiffs pled a claim for Loss of Chance.  ECF 1-1.  Under Hawai'i law, this claim cannot stand.  On May 5, 2020, the Hawai'i Supreme Court, on *certiorari*, **declined** to recognize "Loss of Chance" as a separate compensable tort claim under Hawai'i law.  ***Estate of Frey***

*v. Mastroianni*, 146 Hawai'i 540, 544, 554, 463 P.3d 1197, 1200, 1212 (2020). In its opinion, the Hawai'i Supreme Court expressly noted that "Hawai'i courts, and federal courts applying Hawai'i law, have never recognized loss of chance as an independent and separately compensable cause of action. Nor have they embraced a theory of legal causation other than the one articulated in *Mitchell*." *Id.* at 555, 463 P.3d at 1212. At least in the context of medical malpractice, the *Mastroianni* court deemed "loss of chance" a "relevant consideration in determining whether a defendant's negligence was a substantial factor in causing the plaintiff's injury." *Id.* at 554, 463 P.3d at 1211, *quoting Delaney v. Cade*, 873 P.2d 175, 185-86 (Kan. 1994) ("In an action to recover for the loss of a chance to survive …, the plaintiff **must first prove the traditional elements** of a medical negligence action by a preponderance of the evidence. The plaintiff must prove that the defendant was negligent in treating the patient, that the negligence caused harm to the plaintiff, and that as a result the plaintiff suffered damages. In proving that the plaintiff suffered harm, the plaintiff must prove that the lost chance of survival . . . was a substantial loss of the chance") (emphasis added). It bears noting, however, that the *Mastroianni* court did not stray from the traditional standard of proof of medical causation to a reasonable degree of medical probability. *See Id.* at 554, 463 P.3d at 1211; *Miyamoto v. Lum*, 104 Hawai'i 1, 15-16, 84 P.3d 509, 523-24 (2004) (plaintiff bears burden of proving all requisite elements of negligence,

including legal causation, and in "so doing, the plaintiff may solicit opinions from medical experts, but such medical opinions 'must be grounded upon **reasonable medical probability** as opposed to a mere possibility because possibilities are endless in the field of medicine"). In other words, "reasonable medical probability" must be proven in a court of law, not by terminology or words, but with **evidence**. *See Mastroianni*, 146 Hawai'i at 558, 463 P.3d at 1215 ("in determining whether a medical expert's statement is to a reasonable degree of medical probability, we look … to the evidence itself").

### D. Count XII - Unfair and/or Deceptive Acts or Practices (HRS Chap 480) - Should Be Dismissed as a Matter of Law.

Plaintiffs' lawsuit is *clearly* a personal injury claim. Plaintiffs' UDAP claim thus cannot stand because it has long been settled that HRS §§ 480-2 and 480-13 do not provide a cause of action for personal injury claims. *Beerman v. Toro Manufacturing Corp*., 1 Haw.App. 111, 118, 615 P.2d 749, 754 (1980); *see also*, *Blowers v. Eli Lilly and Co*., 100 F.Supp.2d 1265, 1267 (D.Haw. 2000) (HRS §§ 480-2 and 480-13 do not provide a remedy for personal injury); *Isham v. PADI Worldwide Corp*., 2007 U.S.Dist. LEXIS 62419, at *64 (D.Haw., Aug. 23, 2007) (personal injury plaintiffs cannot maintain UDAP claim because HRS Chap. 480 does not apply to personal injury claims). HRS § 480-13 only allows lawsuits by a "person who is injured in the person's business or property by reason of" the alleged deceptive practice. As the ICA declared in *Beerman*:

> The legislative history to §§ 480-2 and 480-13 makes clear that the paramount purpose of both statutes is to prevent deceptive practices by businesses that are injurious to other businesses and consumers. **It does not reflect a legislative intent that § 480-13 be used as a vehicle for personal injury suits**. Indeed, the trebling of awards under § 480-13, if applied to personal injuries connotes a punitive use of the statute which was specifically rejected by the legislature during its consideration of the original legislation from which § 480-3 [sic] arose.

1 Haw.App. at 118, 615 P.2d at 754-55 (emphases added), *citing Senate Conference Committee Report No. 19, Senate Journal 1075* (1961); *House Conference Committee Report No. 16, House Journal 577* (1961) (affirming summary judgment dismissal of plaintiff's HRS § 480-13 claim arising from personal injury sustained due to allegedly defective product). While HRS Chapter 480 was subsequently amended in 1987, this did <u>not</u> change the statute's express preclusion of personal injury claims. *See **Blowers**,* 100 F.Supp.2d at 1269. Defendants are entitled to summary judgment on Count XII (UDAP claim).

### E.    There is No Factual or Legal Basis for Count XIV - Fraudulent Concealment – Which Should Be Dismissed as a Matter of Law.

It is settled that there is no separate cause of action for fraudulent concealment, for which relief can be granted. Rather, an allegation of fraudulent concealment may only come into play in the context of an SOL challenge. *See, e.g., **Hexcel Corp. v. Ineos Polymers, Inc.***, 681 F.3d 1055, 1059-60 (9th Cir. 2012), *citing **Hennegan v. Pacifico Creative Serv., Inc.***, 787 F.2d 1299, 1302 (9th Cir. 1986) (an SOL may be tolled in limited situations, where defendant fraudulently

concealed the existence of a cause of action such that plaintiff, acting as a reasonable person, did not know of its existence); *Au v. Au*, 63 Haw. 210, 216, 626 P.2d 173, 178 (1981), *quoting* **Weast v. Duffie**, 262 N.W. 401, 402 (1935) ("The fraudulent concealment which will postpone the operation of the statute [of limitations] must be the concealment of the fact that plaintiff has a cause of action") (brackets added); *see also*, HRS § 657-20 (extension by fraudulent concealment).  The *Au* court defined fraudulent concealment as:

> "**employment of artifice, planned to prevent inquiry or escape investigation, and misled or hinder acquirement of information disclosing a right of action.  The acts relied on must be of an affirmative character and fraudulent**."

*Au*, 63 Haw. at 215, 626 P.2d at 178.  Plaintiffs have proffered no evidence that Defendants *affirmatively* and *fraudulently* concealed either known risks associated with the MH medical alert system alleged to be in the possession of Ms. Aoki on November 25, 2019, or the existence of a right of action, to give rise to an extension of the applicable SOL.[2]  Full disclosure of limitations of the system was made to all subscribers, including Ms. Aoki.  CSF at no. 3.  Ms. Aoki's upgraded MH system was successfully set up, tested, and fully operational on January 14, 2014.  CSF at no. 5.  Ms. Aoki's MH system functioned without any reported problem for at least about 5 years and 10-months – until Plaintiffs claimed the

---

[2] At section V.A., *supra*, Defendants are simultaneously seeking summary judgment on Plaintiffs' breach of warranty claims based on the UCC SOL.

system failed on November 25, 2019.  There is simply no factual or legal basis for Plaintiffs' claim of fraudulent concealment.[3]

On August 18, 2021, The Estate was asked to: "14.  Describe in detail all facts, information, and witnesses which you contend support your claim for **fraudulent concealment** in this lawsuit" and responded: "Please see number 6. You knew the unit and pendant were not being tested monthly and did/said nothing.  You knew the battery in the pendant would only last a few years and did/said nothing."  In turn, The Estate responded to interrogatory no. 6 as follows: "You target seniors by advertising in AARP Magazine, for example.  You promised peace of mind 24/7.  You promised to keep Grace Aoki safe.  You failed to honor your promises.  Your failures caused the death of Grace Aoki."  CSF at no. 14.  Neither of The Estate's foregoing interrogatory responses (which are

---

[3] Nor, for that matter, can Plaintiffs establish fraud.  The requisite elements of a claim for fraud, as established by the Hawai'i Supreme Court, are: (1) false representations were made by the defendants; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon these false representations; and  (4) plaintiff did rely upon them. **Ass'n of Apartment Owners of Newtown Meadows v. Venture 15, Inc.**, 115 Hawai'i 232, 263, 167 P.3d 225, 256 (2007) (quoting **Shoppe v. Gucci Am., Inc.**, 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000)) (internal brackets omitted); *see* **Stahl v. Balsara**, 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978) (stating that "fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise").

argumentative, and assert allegations, rather than facts) rises to the level of material evidence that Defendants ***affirmatively*** and ***fraudulently*** concealed either known risks associated with the MH medical alert system alleged to be in the possession of Ms. Aoki on November 25, 2019, or the existence of a right of action.  *See **Au***, 63 Haw. at 215, 626 P.2d at 178.  But even assuming, *arguendo*, that these interrogatory responses could be deemed to raise an issue of material fact (which Defendants dispute, pursuant to FRCP 56(c)(2)), they would at most raise a factual issue with respect to Plaintiffs' *negligence* claim – but <u>not</u> as to their meritless claim for fraudulent concealment.  It is the plaintiff who bears "the burden of pleading and proving fraudulent concealment; it must plead facts showing that [the defendant] affirmatively misled it, and that [the plaintiff] had *neither actual nor constructive knowledge* of the facts giving rise to its claim despite its diligence in trying to uncover those facts."  ***Hexcel***, *supra*, 681 F.3d at 1059-60*, quoting **Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.***, 858 F.2d 499, 502 (9th Cir. 1988) (citing ***Rutledge v. Boston Woven Hose & Rubber Co***., 576 F.2d 248, 249-50 (9th Cir. 1978)) (emphasis & brackets added).  A fraudulent concealment defense requires a two-prong showing that the defendant used fraud to keep the plaintiff ***unaware of his cause of action***, *<u>and</u>* that the plaintiff was, in fact, ignorant of the existence of his cause of action."  ***Wood v. Santa Barbara***

*Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983) (emphasis added).

As to the first prong, this court noted that "[m]erely keeping someone in the dark is not the same as affirmatively misleading him." *Isham, supra,* at \*46-47, *quoting* ***Thorman v. Am. Seafoods Co.***, 421 F.3d 1090, 1095 (9th Cir. 2005).

As to the second prong, this court further stated that the purpose of equitable tolling, particularly in reference to a claim for fraudulent concealment, "focuses on whether there was excusable delay by the plaintiff" and "may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Isham*, *supra*, at \*46-47, *quoting* ***Huseman v. Icicle Seafoods, Inc.,*** 471 F.3d 1116, 1120 (9th Cir. 2006).

Nothing in Plaintiffs' Complaint—which entirely fails to plead *any* alleged fraudulent conduct with the requisite particularity—can salvage this claim.  FRCP Rule 9(b) is clear: "In alleging fraud or mistake, a party must state with particular-ity the circumstances constituting fraud or mistake."  The Ninth Circuit was more explicit: "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" ***Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.***, 637 F.3d 1047, 1055 (9th Cir. 2011); *see also, **Swartz v. KPMG LLP***, 476 F.3d 756, 764 (9th Cir. 2007) ("To comply with

Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong", *quoting Bly—Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)); and *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (a complaint adhering to FRCP Rule 9(b) must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme"). By all of the foregoing, Defendants are entitled to partial summary judgment on Count XIV (fraudulent concealment).

### F.   There is No Evidence, Much Less *Clear and Convincing* Evidence, to Support Plaintiffs' Claim (Count XI) of Gross Negligence Against Defendants.

At Count XI of their Complaint, Plaintiffs allege that the conduct of Defendants "represents an extreme departure from the ordinary standard of care"; "is outrageous and/or exhibits a conscious and voluntary disregard of the need to use reasonable care"; "is willful, wanton and/or in reckless disregard of the rights and/or safety of Plaintiffs"; and "recklessly placed consumers at risk of serious physical injury." ECF 1-1 at ¶¶ 103-105. In Hawai'i, a claim for gross negligence requires "a showing of an entire want of care which would raise the presumption of conscious indifference to consequences." *Mullaney v. Hilton Hotels Corp.*, 634 F.Supp.2d 1130, 1154 (D. Haw. 2009) (citing *Ass'n of Apartment Owners v.*

*Venture 15, Inc.,* 115 Hawai'i 232, 297, 167 P.3d 225, 290 (2007)).  The requisite "entire want of care" cannot be rooted in "mere inadvertence, mistakes or errors in judgment", but rather, "must be such that one would presume that 'the defendant was consciously, *i.e.*, knowingly, indifferent to [the plaintiffs'] rights, welfare, and safety.'"  *Mullaney,* 634 F.Supp.2d at 1154-55, citing *Venture 15,* 115 Hawai'i at 297, 167 P.3d at 290, and *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex. 1981) (brackets in original)).  "This mental attitude is what 'lifts ordinary negligence into gross negligence' and what 'justifies the penal nature of the imposition of exemplary damages.'"  *Mullaney,* 634 F.Supp.2d at 1154 (citing *Burk,* 616 S.W.2d at 922).  Furthermore, Hawai'i law requires that claims of gross negligence be proven by no less than *clear and convincing* evidence.  *See, e.g.*, *Iddings v. Mee-Lee*, 82 Hawai'i, 1, 14, 919 P.2d 263, 276 (1996) (requiring that alleged willful and wanton misconduct, be proven by *clear and convincing* evidence); *Thinh Luong v. Segueira*, 2018 U.S. Dist. LEXIS 168706 at *23-24, 31-33 (D.Haw., Sept. 18, 2018) (claims of gross negligence and/or willful or wanton conduct must be proven by *clear and convincing* evidence); *cf. Udac v. Takata Corp.,* 121 Hawai'i 143, 165-69, 214 P.3d 1133, 1155-59 (App. 2009) (where evidence relied upon by plaintiffs to support punitive damages, did not amount to *clear and convincing* evidence that defendant both had notice of product's susceptibility <u>and</u> acted with an "entire want of care which would raise

the presumption of a conscious indifference to consequences", trial court abused its

discretion by denying defense motion for JMOL on punitive damages).  The

Hawai'i Supreme Court defines **clear and convincing** as:

> "**that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable**."

**Masaki v. General Motors Corp.**, 71 Haw. 1, 15, 780 P.2d 566, 574 (1989); *see*

*also*, **Anderson v. Liberty**, *supra*, 477 U.S. at 252, 256 (to defeat summary

judgment on punitive damages claim, plaintiff must show there exists **clear and**

**convincing** evidence in the record that defendant acted with actual malice);

**Kauhale v. ADT Automotive Servs., Inc.**, 2 F.Supp.2d 1295, 1302-03, n.5 (D.Haw.

1998) (in Hawai'i, punitive damages may be awarded only when defendant has

acted egregiously, with "a character of outrage frequently associated with a

crime"); **Jones v. Phillipson**, 92 Hawai'i 117, 122, 987 P.2d 1015, 1020 (1999)

(punitive damage claim properly denied where there was no evidence, as opposed

to mere speculative testimony, of deception, willful or malicious conduct).

When asked to: "10.  Describe in detail all facts and other information,

which you contend demonstrates *clear and convincing* evidentiary support for your

claim for punitive damages against Defendants in this action[,]" The Estate

responded in part:  "We do not know what this question means."  When further

asked to: "11.  Identity each and every witness whom you will rely upon to

demonstrate *clear and convincing* evidentiary support for your claim for punitive

damages against Defendants in this action[,]" The Estate simply referred

Defendants to no. 10.  CSF at no. 15.  As Plaintiffs have no ***clear and convincing***

evidence that either of Defendants acted with gross negligence, Count XI of the

Complaint should be dismissed as a matter of law.

### G.    Plaintiffs' Claim for Civil Conspiracy (Count XIII) Is Legally and Factually Baseless, and Should Be Dismissed.

Defendants MH and MGH remain in this case.  *See* ECF 26.  At Count XIII

of their Complaint, Plaintiffs pled that MH and MGH "conspired unlawfully" (¶

123); "took significant steps in furtherance of the conspiracy" (¶¶ 124, 125); that

"Defendants' conspiratorial and unlawful conduct was extreme and outrageous" (¶

126); and that Plaintiffs have been damaged as a result (¶¶ 127, 128).  *See* ECF 1-

1.  These allegations are utterly baseless.  CSF at no. 1.  While Plaintiffs *accuse*

MH and MGH of unlawfully conspiring, they have completely failed to allege that

there was an agreement to commit fraud, or that MH and MGH somehow acted in

concert to commit fraud.[4]  Nor do Plaintiffs allege that the conspiracy to commit

fraud caused any damages over and above the alleged fraud itself.  Also, when

asked to: "Describe in detail all facts, information, and witnesses which you

---

[4] Also, there must be *clear and convincing* evidence to support a finding of fraud. *See **Shanghai Inv. Co. v. Alteka Co**.*, 92 Hawai'i 482, 497, 993 P.2d 516, 531 (2000); *overruled on other grds.* by ***Blair v. Ing***, 96 Hawai'i 327, 331 n.6, 335-36, 31 P.3d 184, 188 n.6, 192-93 (2001).

contend support your claim for civil conspiracy in this lawsuit", The Estate

responded: "We do not know what this means."  CSF at no. 2.

"The accepted definition of a conspiracy is a combination of two or more

persons [or entities] by concerted action to accomplish a criminal or unlawful

purpose, or to accomplish some purpose not in itself criminal or unlawful by

criminal or unlawful means."  ***Robert's Haw. Sch. Bus. Inc. v. Laupahoehoe***

***Transp. Co***., 91 Hawai'i 224,252 n.28, 982 P.2d 853, 881 n.28 (1999), *overruled*

*on oth. grds. by* ***Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n***, 113 Hawai'i 77, 148

P.3d 1179 (2006).  More recently, civil conspiracy was addressed in ***Miyashiro v.***

***Roehrig, Roehrig, Wilson & Hara***, 122 Hawai'i 461, 482, 228 P.3d 341, 362

(App. 2010):

> The Hawai'i Supreme Court has defined civil conspiracy as the "combination of two or more persons or entities by concerted action to accomplish a **criminal or unlawful purpose**, or to accomplish some purpose not in itself criminal or unlawful by **criminal or unlawful means**." The supreme court explained that "[c]ivil conspiracy does not alone constitute a claim for relief."  In other words, concerted action is not enough. A civil conspiracy claim must include either that the alleged conspirators had a *criminal or unlawful purpose* for their concerted action or that the alleged conspirators used criminal or *unlawful means* to accomplish a lawful objective.

(internal citations omitted).  *See also,* ***Adams v. Dole Food Co***., 132 Hawai'i 478,

490, 323 P.3d 122, 134 (App. 2014) ("there can be no civil claim based upon a

conspiracy alone") (quoting ***Ellis v. Crockett***, 51 Haw. 45, 57, 451 P.2d 814, 822

(1969)); ***Tour2000 Co. v. Koreana Tour Serv., Inc.,*** 2009 Haw. App. Lexis 675, at

*26 (Oct. 23, 2009) ("civil conspiracy does not alone constitute a claim for relief" and "mere acquiescence or knowledge is insufficient to constitute a conspiracy, absent approval, cooperation, or agreement"); *Zimmerman v. Grolle,* 38 Haw. 217, 226 (Haw. 1948) ("mere knowledge, acquiescence, or approval of the act, without co-operation or agreement to co-operate, is not enough to constitute one a party to a conspiracy.  There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose") (footnote & citation omitted).

Thus, to prevail on a claim for civil conspiracy, Plaintiffs cannot merely allege, but must **_prove_** there was (a) an agreement by two or more persons, (b) to accomplish an unlawful purpose, and (c) that the alleged conspiracy caused damages.  Here, Plaintiffs have completely failed to establish the elements essential to a civil conspiracy claim, thus FRCP 56(a) mandates that partial summary judgment be entered against them on such claim as a matter of law. *Celotex*, 477 U.S. at 322, 325.

### H.   As Plaintiffs Cannot Prove the Cause of Grace S. Aoki's Death, They Cannot Prove Defendants Were the Legal Cause of Her Death.

HRS § 663-3 permits recovery where "the death of a person *is caused by* the wrongful act, neglect, or default of any person." (emphasis added).  To state a cognizable wrongful death claim, Plaintiffs must describe Defendants' wrongful

acts and state facts sufficient to establish <u>how</u> the alleged wrongful acts **caused** the death of Grace S. Aoki. *See **Hyer v. C&C of Honolulu***, 2020 U.S.Dist. Lexis 223621, *32-33 (D.Haw., Nov. 30, 2020). Here, Plaintiffs allege that the MH medical alert system failed and such failure **caused** Grace S. Aoki's death, which in turn caused loss of consortium to Plaintiffs Colette and Charlene Aoki. *See* ECF 1-1, ¶¶ 36, 37, 48, 49, 56, 62, 67, 99, 101[5]. Plaintiffs allege, *inter alia*, that the MH medical alert system failure amounts to Negligence (**Count I**), Negligent Failure to Warn (**Count II**), Strict Product Liability (**Count III**), and Strict Product Liability-Failure to Warn (**Count IV**). *See* ECF 1-1, ¶¶ 48, 55, 61, 66[6]. But the mere co-existence of negligence and injury establishes nothing. *See **Mitchell v. Branch***, 45 Haw. 128, 131-32, 363 P.2d 969, 973 (1961). Hawai'i law is clear that whether Plaintiffs proceed on a negligence theory, or a strict product liability (defect) theory, they <u>must</u> prove, by a preponderance of the evidence, that Defendants **legally caused** Grace S. Aoki's death. ***Wagatsuma v. Patch***, 10 Haw.App. 547, 564, 879 P.2d 572, 583 (1994), *cert. denied* (1994); *see also, **Miyamoto**, supra,* 104 Hawai'i at 15, 84 P.3d at 523 (plaintiff bears burden of proving all elements of

---

[5] It is settled that "where the initial claim of injury cannot be maintained[,] the derivative action of loss of consortium must also fail." *Towse v. State*, 64 Haw. 624, 636, 647 P.2d 696, 705 (1982). Thus, to the extent some or all of the claims addressed in this Motion are dismissed on summary judgment, so too would any claims for loss of consortium deriving therefrom. *See* **Count X** of Plaintiffs' Complaint.

[6] Erroneously referring to "electronic cigarette".

negligence, including *legal causation*); *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 354, 944 P.2d 1279, 1297 (1997) (in strict product liability, plaintiffs bear the burden of proving: "(1) a defect in the product which rendered it unreasonably dangerous for its intended or reasonably foreseeable use; and (2) a *causal connection* between the defect and [the] plaintiff's injuries"); *Aga v. Hundahl*, 78 Hawai'i 230, 236, 891 P.2d 1022, 1028 (1995) (defendant's conduct is a *legal cause* of injury if the conduct is a substantial factor in bringing about the injury). A defendant cannot be held liable "for every possible result of his or her conduct" and the plaintiff must **prove** that the defendant's conduct was a *legal cause* of the harm – meaning "a cause that is legally sufficient to result in liability." *O'Grady v. State*, 140 Hawai'i 36, 44, 398 P.3d 625, 633 (2017).

In this case, no autopsy of Grace S. Aoki was conducted, and her body was cremated on December 2, 2019.  CSF at nos. 12, 13.  While a Certificate of Death ("COD") was completed and certified on November 27, 2019 by Ms. Aoki's last PCP, Dr. Kohatsu[7], the COD was admittedly not based upon an autopsy or other forensic examination, or even a physical examination of the body.  Rather, Dr.

---

[7] Dr. Kohatsu was Ms. Aoki's PCP from October 31, 2017 until her death on November 25, 2019.  CSF at no. 17.  Dr. Kohatsu is neither board-certified in anatomic pathology nor forensic pathology, and is not qualified to perform an autopsy in the State of Hawaii.  CSF at no. 18; *see* HRS § 841-14.5.

Kohatsu relied on his "*best information and belief*" from what information was available to him at the time.  *See* HRS §338-9(b)(2) (upon presentation of COD to physician "last in attendance upon the deceased", physician shall certify the cause of death to his "*best knowledge and belief*").  CSF at no. 17.

Dr. Kohatsu could not deny that an autopsy would provide more information regarding physical pathology "of what may be going on", abnormalities, disease processes, trauma, and information regarding sources of bleeding.  He agreed that an autopsy would have facilitated more study of the deceased and generated more information about her death.  Dr. Kohatsu could not say if and when Ms. Aoki lost consciousness on 11/25/19; he could not give a specific time of her death; he did not recall receiving information as to a head injury experienced by Ms. Aoki; he could not give a specific pathology and diagnosis for the source(s) of Ms. Aoki's GI bleeding on 11/25/19; he could not rule out the possibility that Ms. Aoki suffered a stroke or a heart attack on 11/25/19; he could not say one way or the other whether Ms. Aoki lost consciousness before she expired; and did not know one way or the other whether Ms. Aoki suffered a head injury on 11/25/19.  CSF at no. 17.  In other words, without more information, Dr. Kohatsu could not opine as to what actually caused Ms. Aoki's death, to a reasonable degree of medical probability.   CSF at no. 18.

Of particular pertinence to the instant case, and under remarkably similar facts, the Appellate Court of Connecticut in ***Theodore v. Lifeline Sys. Co***., 173 Conn. App. 291, 308, 163 A.3d 654, 665 (2017) declared that "[p]roof that a defect in the product caused the injury in controversy is a prerequisite to recovery for product-caused injury in every products liability case," whether based on negligence, warranty, strict liability, or a combination thereof.  *See* **Exhibit P**. There, an 88-year old woman who lived alone, was found face down and deceased in the hallway of her home.  Bloody stool was observed in the toilet, believed to be related to GI bleeding.  *Id.*, 163 A.3d at 658, 659.  No autopsy was performed.  *Id.* at 670.  Her Estate sued Lifeline Sys. Co., provider of the medical alert system in the decedent's home, alleging that the decedent had pressed one of the available buttons to initiate a signal to the call center, but no emergency assistance was sent. At the close of the plaintiff's case, the trial court granted defendants' motion for a directed verdict, for plaintiff's failure to establish causation.  *Id.* at 660.  In particular, while the decedent's PCP had testified, to within a reasonable degree of medical probability, that her GI bleed was a *contributing factor* in her death, he could not opine that the GI bleed was the sole cause of her death.  *Id.* at 660-61. Indeed, she could have died "from any number of causes of which the GI bleed was a contributing factor, including cerebral vascular disease, heart attack, or stroke."  Nor could her PCP opine to a reasonable degree of medical probability,

that had she activated her Lifeline device, she would have lived. *Id.* at 661. On appeal from the trial court's ruling, the appellate court **affirmed**. The ***Theodore*** court held that to demonstrate the requisite causation, it was essential that plaintiff prove what caused the decedent's death. *Id.* at 669-70. Noting the absence of an autopsy, the ***Theodore*** court found that without evidence of the cause and timing of the decedent's death, the jury could not find that defendants caused her death, or any amount of suffering prior to her death – unless it resorted to conjecture and speculation, which is of course, impermissible. *See Id.* at 670. The plaintiff had failed to "establish a sequence of events causally flowing from the defendants' negligence to her death." *Id.* The ***Theodore*** court observed that even *if* plaintiff presented evidence that the decedent had actually utilized her Lifeline device to summon help, this at most supported an inference that she died while waiting for a response – but not that her death was caused by the lack of such response. *Id.*

Here, Plaintiffs' case suffers from similar infirmities as in ***Theodore***. Plaintiffs have no credible evidence whether, when, and if so, how, in fact, Grace S. Aoki attempted to press <u>any</u> of her medical alert buttons on November 25, 2019; no credible evidence whether, when, and if so, how, in fact, the pendant failed on November 25, 2019; and no credible evidence establishing the time and cause(s) of Grace S. Aoki's death on November 25, 2019, to a reasonable degree of medical probability. Without such evidence, Plaintiffs' case is one of conjecture and

speculation.  Without such evidence, Plaintiffs cannot meet their burden of proving that Defendants were a ***legal cause*** of Grace S. Aoki's death – that is, a substantial factor in bringing about Ms. Aoki's death.  As such, all of Plaintiffs' claims must fail for lack of causation.

## VI.    CONCLUSION

There being no genuine issue as to any material fact, Defendants are entitled to summary judgment on Counts V, VI, VII, VIII, IX, XI, XII, XIII, and XIV as a matter of law.

***In addition***, Defendants are entitled to summary judgment on **all** of Plaintiffs' claims (including, without limitation, Counts I, II, III, IV, and X), because, *inter alia*, Plaintiffs have not proven and cannot prove the time and cause of Grace S. Aoki's death, to a reasonable degree of medical probability.  As such, Plaintiffs cannot establish that Defendants were a ***legal cause*** of Grace S. Aoki's death, and Plaintiffs' claims fail for lack of causation.

DATED:  Honolulu, Hawaii, November 15, 2021.

*/s/ Lois H. Yamaguchi*

_____
ARTHUR F. ROECA
LOIS H. YAMAGUCHI
JODIE D. ROECA
Attorneys for Defendants
MOBILEHELP, LLC and MOBILEHELP
GROUP HOLDINGS, LLC